UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DEVY FELICIANO, *pro se*, :
:
               Plaintiff, :
: **MEMORANDUM AND ORDER**
        -against- : 05-CV-4066 (DLI) (MDG)
:
MICHAEL J. ASTRUE,[1] :
Commissioner of Social Security :
:
               Defendant. :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

*Pro se* plaintiff Devy Feliciano ("Plaintiff") filed an application for supplemental security income ("SSI") under the Social Security Act (the "Act") on March 8, 2002. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on December 29, 2003. By decision dated January 16, 2004, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On June 24, 2005, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff filed the instant action seeking judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). The Commissioner now moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits on the grounds that the ALJ properly determined that plaintiff was not disabled, and the factual findings are supported by substantial evidence. *Pro se* Plaintiff did not oppose the instant motion. For the reasons set forth more fully below, Commissioner's motion is denied. The court finds that the ALJ failed to adequately develop the

---

[1]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

record and improperly applied the treating physician rule. The court remands this case to the Commissioner for further proceedings.

## BACKGROUND

A.   **Testimonial and Nonmedical Evidence**

On December 29, 2003, Plaintiff appeared and testified before ALJ Martin K. Kahn. (Tr. 351). Plaintiff, a 42-year-old woman with a high school equivalency diploma, worked "on an off" as a waitress beginning in 1989. (Tr. 353-54). In 1999, Plaintiff stopped working due to chronic joint pain, fatigue, dizziness, asthma, and high blood pressure. (Tr. 354-55). Plaintiff testified that she remains in bed most days, watching television or using the computer and that her son assisted her with grocery shopping, cooking, and cleaning. (Tr. 373-74).

Plaintiff was diagnosed with Lupus, which caused her to continuously experience pain in her left hip and leg. (Tr. 355, 359). Additionally, Plaintiff experienced minor and major "flare-ups," which caused joint pain, significant joint swelling, fatigue, nausea, vomiting, abdominal cramps, diarrhea, increased blood pressure, aggravation of asthma, and bad chest pains. (Tr. 356-57, 359). Plaintiff testified that these symptoms inhibited her ability to function. Pain in her fingers prevented her from lifting more than five or six pounds. (Tr. 361). Pain in her left hip and lower back prevented her from standing or sitting for more than ten or fifteen minutes. (Tr. 360). Plaintiff was hospitalized in April, June, and October of 2003. (Tr. 366-68). In addition to these physical impairments, Plaintiff testified that she was bipolar and suffered from post-traumatic stress syndrome. (Tr. 362). She thought about her own death and attempted suicide while under

the influence of alcohol in September of 2002.[2] (Tr. 365, 378). Additionally, she suffered from panic attacks, particularly when she knew she had to leave her home. (Tr. 364).

Plaintiff took prescription medication for her psychiatric problems with limited success. (Tr. 372). She took Plaquenil for Lupus, experiencing hair loss and rashes as side effects. (Tr. 372-73). She took Advair, Abuterol, and used a nebulizer for asthma; however she continued to suffer from attacks. (Tr. 369-70, 379). Plaintiff took medication that controlled her blood pressure. (Tr. 375). She stated that the longest she went without taking medication was three months, and that depression prevented her from obtaining medication at that time. (Tr. 385).

**B.     Medical and Psychiatric Evidence**

**1.     Plaintiff's Medical and Psychological Evidence**

In November 2001, Plaintiff visited Dr. Melissa Tracy at the Montefiore Hospital and Medical Center emergency room complaining of chest pains, palpitations, and nearly fainting. (Tr. 124, 126). She was treated and discharged with a prescription for Nefedipine. (Tr. 125). In January 2002, Dr. Wiggs, of Jamaica Hospital, diagnosed Plaintiff with lupus and hypertension. (Tr. 151). Dr. Wiggs noted that Plaintiff was being treated for hypertension, systemic lupus erythematous, and depression. (Tr. 152). Plaintiff visited Dr. Wiggs in May 2002, complaining of increased anxiety and depression, as well as joint pain. (Tr. 247). Dr. Wiggs prescribed Celebrex, Prozac, and Tylenol. (Tr. 248). In June 2002, Dr. Wiggs diagnosed Plaintiff with panic disorder with agoraphobia, anxiety, depression, lupus, and hypertension. (Tr. 249-50). Dr. Wiggs substituted Bextra for Celebrex and refilled prescriptions for Procardia, Ventolin, Trazodone and Klonopin. (*Id.*) In July 2002, Dr. Wiggs diagnosed Plaintiff with dermatitis, proscribed Proventil

---

[2] There are no records of Plaintiff attempting suicide; however Plaintiff was hospitalized on September 15, 2002 for depression and anxiety. The medical records for this incident indicate Plaintiff was intoxicated and fell.

for asthma, and referred Plaintiff to a rheumatologist. (Tr. 254). In September 2002, Plaintiff was admitted to Montefiore Medical Center for an extracranial hematoma and for depression after falling and injuring her head due to alcohol consumption. (Tr. 203, 217). Plaintiff was anxious and reported wanting to hurt herself. (Tr. 203, 217). Plaintiff's depression coincided with her alcohol use. (Tr. 223). She was discharged the next day. (Tr. 205).

Svetlana Gavrilova, M.D., completed a Medical Source Statement of Ability to Do Work-Related Activities on January 9, 2003. (Tr. 195-99). According to the statement, Dr. Gavrilova first saw Plaintiff on January 12, 2002. (Tr. 195). Plaintiff's symptoms included joint, chest, and abdominal pain, and difficulty ambulating. (*Id.*) She diagnosed Plaintiff with lupus, asthma, anxiety, hypertension, and panic disorder with agoraphobia. (*Id.*) Plaintiff had a limited ability to reach, handle, finger, and feel. (Tr. 198). Plaintiff could occasionally lift less than ten pounds, could stand or walk less than two hours in an eight-hour work day, and could sit for less than six hours in an eight-hour workday. (Tr. 196-97). In support of these conclusions, Dr. Gavrilova noted that the "[p]atient can carry items less than 5 lbs and can't sit more than 10 min[ute]s." (Tr. 197). Plaintiff alleges that Dr. Svetlana Gavrilova is her treating physician; however, when asked if she recognized Dr. Gavrilova's name, Plaintiff answered that she did not. (Tr. 384).

In May 2003, Plaintiff was hospitalized with difficulty breathing, chest pain, and a cough. (Tr. 265). In July 2003, Plaintiff visited Dr. Wiggs for medication refills. (Tr. 266). The report for this visit indicated Plaintiff had not taken her medications for seven months. (*Id.*) Dr. Wiggs prescribed Klonopin, Flovent, Singulair, Mocardia, Plaquenil, Prevarid, Atarax, Bextra, and Trazadone, and directed Plaintiff to consult with rheumatology, to attend physical therapy, and to obtain a mammogram. (Tr. 267).

## 2. Agency Consults

On March 27, 2002, Plaintiff visited Steven Rocker, M.D, who diagnosed her with multiple myalgia/arthalgia, probable fibromyalgia, hypertension, obesity, asthma, and depression. (Tr. 164-65). He concluded that Plaintiff was "physically able to perform sedentary, light and moderate work activity," and that her prognosis was "fair." (*Id*.)

Robert Cicarell, M.D., evaluated Plaintiff on March 27, 2002. (Tr. 166). Dr. Cicarell noted that Plaintiff's speech was normal in rate and rhythm and her thought process was logical and coherent. (Tr. 167). She was alert and her memory was within normal limits. (*Id*.) She could do simple calculations and her overall intellectual functioning was within normal limits. (*Id*.) She possessed emotional insight and her judgment was determined to be "fair." (Tr. 168). Her attention and concentration, on the other hand, were markedly impaired. (Tr. 167). He diagnosed Plaintiff with panic disorder with agoraphobia, dysthymic disorder, polysubstance dependence in sustained full remission, and alcohol dependence in sustained full remission. (Tr. 168). Dr. Cicarell stated that her prognosis was "fair to guarded." (*Id*.) Dr. Cicarell further stated that Plaintiff was capable of managing her funds and had "a limited to fair ability to understand, carry out and remember instructions in a work setting." (*Id*.)

On April 5, 2002, Andrea Horton, an Agency Disability Analyst, requested medical advice from Thomas Harding, Ph.D. (Tr. 169). Dr. Harding reviewed Plaintiff's file and concluded that Plaintiff had mild limitation with regard to the restriction of activities of daily living.[3] (Tr. 186). She had a moderate restriction with regard to difficulties in maintaining social function and difficulties in maintaining concentration, persistence, or pace. (*Id*.) There was insufficient

---

[3] The rating of functional limitations is based on a five point scale of increasing severity: 1. None, 2. Mild, 3. Moderate, 4. Marked, and 5. Extreme. (Tr. 187.) A marked limitation is the degree of limitation that satisfies the functional criteria. (*Id*.)

evidence of repeated episodes of deterioration. (*Id*.) The evidence did not establish the presence of the "C" criteria. (Tr. 188). Dr Harding concluded that Plaintiff's psychiatric limitations were "mild to moderately severe such that she is found capable of unskilled work." (Tr. 169). Ms. Horton subsequently determined that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or sitting for a total of six hours in an eight-hour work day, and had an unlimited ability to push or pull. (Tr. 172). She noted that Plaintiff was unable to perform past related work; however, Plaintiff retained "light level" residual functional capacity and was "not disabled." (Tr. 25-26).

### 3. Patient's Medical Evidence Subsequent to the ALJ Decision

In April 2004, Plaintiff was treated at Jamaica Hospital Medical Center for acute asthma on two occasions, and was instructed to refrain from work. (Tr. 332-34, 327). In August 2004, Plaintiff applied for psychotherapy at the Advanced Center for Psychotherapy. (Tr. 3, 41). The center requested a report of medical findings from Dr. Mateo, who stated that Plaintiff suffered from lupus, asthma, gastroesophogal reflux disease, depression, and anxiety. (*Id*.) Dr. Mateo completed a Lupus Impairment Questionnaire in September 2004. (Tr. 342). Dr. Mateo had treated Plaintiff several times annually since January 2004. (*Id*.) Dr. Mateo stated that Plaintiff's primary symptoms included abdominal pain, chest pain, headache, diarrhea/constipation, nausea/emesis, heartburn, fatigue, depression, shortness of breath, trouble sleeping, ankle swelling, and athralgia of the fingers, wrists, elbows, and hips. (Tr. 344-45). As a result of these impairments, Dr. Mateo concluded that Plaintiff could stand and sit continuously for less than one hour in an eight-hour work day. (Tr. 345). Plaintiff could occasionally lift and carry five pounds or less, but never more than five pounds. (Tr. 345-46). Plaintiff constantly experienced "pain or

other symptoms severe enough to interfere with attention and concentration," and her impairments could be expected to last more than twelve months. (Tr. 346). Emotional factors did not contribute to the severity of symptoms and functional limitations. (Tr. 347). He indicated that Plaintiff should avoid fumes, gases, humidity, and dust, and that Plaintiff could not engage in pushing, pulling, kneeling, bending, or stooping. (*Id.*) In his opinion, she was "[i]ncapable of even [a] 'low stress' job." (*Id.*)

## DISCUSSION

**A.     Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring actions in federal courts seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). District courts, reviewing final determinations of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

District courts are empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). Remand is also appropriate when "there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

**B.  Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of proof and must demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether claimants are disabled under the Act, as set forth in 20 C.F.R. § 404.1520. If at any step, an ALJ finds that a claimant is either

8

disabled or not disabled, the inquiry ends there. First, claimants are not disabled if they are working and performing "substantial gainful activity." 20 C.F.R. § 416.920. Second, ALJs consider whether claimants have severe impairments, without reference to age, education or work experience. To be considered disabled, claimants must have an impairment, or combination of impairments, that significantly limit their physical or mental ability to do basic work activities, satisfying the durational requirement in § 404.1509. *See* 20 C.F.R § 416.920(c). Third, ALJs will find claimants disabled if their impairments meet or equal one of the impairments listed in Appendix 1.[4] 20 C.F.R. § 416.920(d).

When claimants do not have listed impairments, ALJs then make findings as to their "residual functional capacity" in steps four and five. 20 C.F.R. § 416.920(e). In the fourth step, claimants are not found disabled if they are able to perform "past relevant work." 20 C.F.R. § 416.920(f). Finally, in the fifth step, ALJs determine whether claimants can adjust to other work that exists in the national economy, considering factors such as age, education, and work experience. If so, claimants are not disabled. 20 C.F.R. § 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

**C.     ALJ's Decision**

The ALJ applied the five-step sequential analysis set forth in 20 C.F.R. § 416.920. He resolved step one in Plaintiff's favor as she had not performed substantial gainful activity since the alleged onset of disability. (Tr. 22). At step two, the ALJ found that Plaintiff's lupus, anxiety, and depression were considered "severe" impairments, as defined by the Act. (*Id.*) The ALJ resolved step three against Plaintiff, finding that her impairments did not meet or medically

---

[4]     20 C.F.R. pt. 404, subpt. P, app. 1.

equal one of the impairments listed in Appendix 1.[5] (*Id.*) The ALJ next analyzed Plaintiff's residual functional capacity. (*Id.*) The ALJ determined that controlling weight should not be given to the "brief note" of Dr. Gavrilova because (i) the opinion did not contain "a single example of objective medical findings," (ii) the note appeared to contain two distinctive handwritings, (iii) the note's veracity could not be ascertained, and (iv) Plaintiff did not recognize the physician's name. (Tr. 15). The ALJ also found that Plaintiff's alleged limitations were not credible as they were not supported by "objective clinical evidence." (Tr. 19, 22). The ALJ relied on the findings of Drs. Rocker and Harding to conclude that Plaintiff retained the residual functional capacity for light and sedentary work. (Tr. 20). This capacity included her past relevant work as a waitress and cashier. (Tr. 21). Plaintiff's capacity for light work was substantially intact and not compromised by any nonexertional limitations. (Tr. 23).

**D.    Application**

The Commissioner moves for judgment on the pleadings, seeking affirmation of his denial of benefits on the grounds that the ALJ properly determined that plaintiff was not disabled, and the factual findings are supported by substantial evidence. Plaintiff does not oppose the instant motion; however, the court will view the facts most favorably to Plaintiff, the non-moving party. Moreover, the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

**1.    Plaintiff's Psychological Impairment**

To establish a condition that is disabling *per se*, a claimant must show that the alleged impairment satisfies each element set forth in the definition of a listed impairment. *See Sullivan*

---

[5]    20 C.F.R. pt. 404, subpt. P, app. 1.

*v. Zebley*, 493 U.S. 521, 531 (1990); *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999). The elements of a mental disorder under listing 12.00 include (1) a medically substantiated mental disorder; and (2) a marked limitation in *at least two* of the following impairment related functional limitations: restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.00, 12.04, 12.06. Alternatively, under listing 12.02 (Organic Mental), 12.03 (Schizophrenic, etc.), 12.04 (Affective Disorder), or 12.06 (Anxiety Related Disorder), a claimant may satisfy the requirements of a listed mental impairment by having a medically substantiated mental impairment and functional limitations that meet the "C" criteria of the listings.[6]

Substantial evidence, including the reports of Drs. Cicarell and Harding, support the ALJ's conclusion that Plaintiff's psychological impairments failed to qualify as a listed impairment. Dr. Harding and Dr. Cicarell diagnosed Plaintiff with Dysthmymic Disorder, an Affective Disorder under listing 12.04, and Panic Disorder with Agoraphobia, an Anxiety Related Disorder under listing 12.06. (Tr. 181, 183). These diagnoses satisfy the first element of a listed mental impairment; however, Plaintiff's psychological impairments did not rise to the level of a marked limitation or satisfy the "C" criteria.

---

[6] For listings 12.02-12.04, "C" criteria are met with a medically documented history of the mental impairment for at least two years that caused "more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) Repeated episodes of decompensation, each of extended duration[;] (2) A residual disease that has resulted in such marginal adjustment that even minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[; or] (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.02-12.04. For listing 12.06, the "C" criteria is met if the mental impairment caused the "Complete inability to function independently outside the area of one's home." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06.

Dr. Cicarell found that Plaintiff had a limited-to-fair ability to understand, carry out, and remember instructions in a work setting. (Tr. 168). Plaintiff had a normal rate and rhythm in her speech, and a logical thought process. (Tr. 167). She was alert, her memory was normal, she had emotional insight, and she had fair judgment. (*Id*.) Overall, Dr. Cicarell judged Plaintiff's intellectual functioning to be within normal limits. (*Id*.) After reviewing Plaintiff's file, Dr. Harding agreed with the above conclusions and added that Plaintiff's completion of her forms are "not suggestive of severe limitations based upon psych[ological] factors . . . ." (Tr. 169). Dr. Harding concluded that Plaintiff had mild limitation in the restriction of activities of daily living and a moderate restriction in difficulties in maintaining social function and difficulties in maintaining concentration, persistence, or pace. (Tr. 187). The evidence did not establish the presence of the "C" criteria. (Tr. 188). Dr Harding concluded that Plaintiff's psychiatric limitations were "mild to moderately severe such that she is found capable of unskilled work." (Tr. 169). The ALJ noted that "no difficulties were observed during a Face-to-Face interview with an employee at the local Social Security Office" and that Plaintiff "was able to understand, concentrate, and answer all questions and procedures." (Tr. 20). Substantial evidence supports the ALJ's decision that Plaintiff does not have a listed psychological impairment.

In her papers to the Appeals Council, Plaintiff correctly noted that Drs. Cicarell and Harding, both agency consultants, disagreed as to Plaintiff's concentration limitation. Dr. Cicarell found Plaintiff "markedly limited" in concentrating; whereas, Dr. Harding found Plaintiff had only "moderate" difficulty concentrating. (*Id*. at 167, 187). Plaintiff contended that the ALJ improperly relied on Dr. Harding's conclusion. However, his reliance is harmless. To satisfy the listing, Plaintiff must suffer from at least two functional limitations. The doctors disagreed over

12

the severity of one limitation—concentration—and gave no indications of other market limitations. Substantial evidence supports the ALJ's decision that Plaintiff does not have a listed psychological impairment.

2.  **Plaintiff's Residual Functional Capacity**

ALJs must "investigate the facts and develop the arguments both for and against granting benefits . . . ." *Sims v. Apfel*, 530 U.S. 103, 110 (U.S. 2000). ALJs must compile a claimant's "complete medical history" and make "every reasonable effort" to help obtain the necessary medical reports. 20 C.F.R. § 404.1512(d). Reasonable efforts include an initial request for records and, if not received, one follow-up request. 20 C.F.R. § 404.1512(d)(1). If the evidence received is insufficient, ALJs must contact medical sources for additional information. 20 C.F.R. § 404.1512(e). This duty exists whether or not Plaintiff is represented. *Perez v. Chater*, 77 F.3d 41, 47 (2d. Cir. 1996). This responsibility is particularly important with respect to the medical records of a treating physician. *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999).

A treating physician's opinion on the "nature and severity" of an impairment must be given controlling weight when "supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in [the] record . . . ." *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (citing 20 C.F.R. 404.1527(d)). If an ALJ determines that a treating physician's opinion should not be given controlling weight, the proper weight accorded depends upon several factors: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20

C.F.R. § 404.1527(d)). ALJs must "give good reasons" as to the weight accorded to a treating physician's opinion. *Id*.

In Plaintiff's appeal to the SSA Council, she stated that Dr. Svetlana Gavrilova[7] was her treating physician. (Tr. 337). On January 9, 2003, Dr. Gavrilova indicated that Plaintiff's residual functional capacity was less than the full range of sedentary activity. (Tr. 196-199). The ALJ did not give Dr. Gavrilova's medical findings controlling weight and instead relied on the reports of Drs. Rocker and Harding, who found Plaintiff not disabled. (Tr. 15, 20). In support of this decision, the ALJ stated that Dr. Gavrilova's medical source statement lacked the necessary medically acceptable clinical and laboratory diagnostic techniques to be given controlling weight. (Tr. 15). Additionally, the ALJ did not find the record credible.

If a treating physician's opinion lacks the required support, the ALJ must seek additional information. *See Schaal*, 134 F.3d at 505. A physician's failure to include the required support "does not mean that such support does not exist"; rather the treating physician "might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Clark*, 143 F.3d at 118. The ALJ must contact treating physicians, psychologists, and other medical sources to seek "additional evidence or clarification" regarding any conflict, ambiguity, or lack of clinical or diagnostic support. 20 C.F.R. § 404.1512(e)(1). The only exception to this requirement is when it is "know[n] from past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R. § 404.1512(e)(2). There is no evidence indicating that the ALJ made any effort to elicit medical

---

[7] Plaintiff's letter to the Appeals Council refers to a Dr. Svetlana Gavrilous. There is some confusion over this name; in the hearing Dr. Gavrilova was used, whereas the ALJ's decision and Plaintiff's letter to the Appeals Council refers to Dr. Gavrilous. The Court concludes, based on a review of the entire record, that the doctor in question is Dr. Svetlana Gavrilova.

reports or information from Dr. Gavrilova or that the ALJ had reason to believe Dr. Gavrilova would not provide such information. Consequently, it was improper for the ALJ to discount the conclusions of Dr. Gavrilova without recontacting her and seeking additional medical records.

Regarding the veracity of the record, the ALJ noted that Dr. Gavrilova's report contained two handwritings and that he could not ascertain whether she did, in fact, author the record. (Tr. 15). On the report's final page, a large "X" is drawn through Dr. Gavrilova's name, the date, and a written passage describing Plaintiff's environmental limitations. (Tr. 199). The reliability of Dr. Gavrilova's statement is questionable; however, the only way to resolve this uncertainty was to contact Dr. Gavrilova to request additional medical records or to ask her about the statement. *See* 20 CFR § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."). Dr. Gavrilova's statement was Plaintiff's only medical evidence addressing her residual functional capacity and disability. Dr. Gavrilova's treating diagnoses were not contradicted by any other doctor that observed Plaintiff, including Drs. Rocker and Cicarell.[8] Additionally, the statement referred to monthly visits from January 2002 through January 2003. (Tr. 195). Yet, the record includes only one report. (Tr. 195-99). Only through further investigation can the veracity of Dr. Gavrilova's medical source statement and Plaintiff's disability be properly evaluated.

---

[8] Dr. Gavrilova diagnosed Plaintiff with lupus, asthma, anxiety, depression, hypertension, and panic disorder with agoraphobia. These diagnoses are supported by the medical record and not contradicted by the evaluations made by Drs. Barr, Wiggs, Rocker, Cicarell, and Harding.

15

In addition to not performing this investigation, the ALJ did not inform Plaintiff of his skepticism of Dr. Gavrilova's medical reports or of the importance of submitting additional evidence.[9] (Tr. 384). The ALJ should have informed Plaintiff that he doubted the veracity of Dr. Gavrilova's statement and intended to disregard her conclusions. By making his doubts clear to Plaintiff, Plaintiff could have sought further evidence to support her claim. *See Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990) ("Had [Plaintiff] been apprised of the ALJ's skepticism, he, unlike the ALJ, may have been persistent about obtaining his medical records and a detailed statement from [his treating physician].") Instead, the ALJ merely asked Plaintiff whether she recognized the name Svetlana Gavrilova. (Tr. 384). When Plaintiff stated that she did not, the ALJ concluded his questioning and made no further comments. (*Id.*) Because the ALJ neither contacted Dr. Gavrilova nor advised Plaintiff that he doubted the veracity of Dr. Gavrilova's report, the ALJ failed to adequately develop the record and apply the treating physician rule.

3. **Remand**

On remand, the ALJ should seek additional medical records from Dr. Gavrilova and should include an evaluation of new medical evidence in his analysis. *Perez*, 77 F.3d at 45 (quoting *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)) (noting that the administrative record should contain all evidence submitted before the council's final decision, including the new evidence that was not before the ALJ). Moreover, the Commissioner shall take all steps necessary to prevent any undue delay in processing Plaintiff's case, and in conducting further proceedings before the ALJ. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004).

---

[9] The ALJ did state that he did not have medical records from three hospital visits in 2003; however, the ALJ never mentioned the need for other medical records.

## CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is denied and this matter is remanded to the Commissioner for further evidentiary proceedings consistent with this Order.

SO ORDERED

DATED:   Brooklyn, New York
         August 20, 2008

                             _____/s/_____
                             DORA L. IRIZARRY
                             United States District Judge